UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| JOHN CERVANTES, | ) | 3:11-CV-0242-VPC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER** |
| vs. | ) | |
| | ) | |
| EMERALD CASCADE RESTAURANT SYSTEMS, INC., dba JACK-IN-THE-BOX, INC., | ) ) ) | |
| | ) | |
| Defendant. | ) | |

Before the court is the motion of defendant Emerald Cascade Restaurant Systems, Inc. d.b.a. Jack-in-the-Box ("defendant" or "Jack-in-the-Box') for an order reducing the jury's punitive damages award pursuant to Fed.R.Civ.P. 59(e) (#65). Plaintiff John Cervantes ("plaintiff") opposed the motion (#68), and defendant replied (#70).

**I.   Procedural History**

This is a punitive damages case concerning nominal compensatory damages brought by an employee who claimed race discrimination. The case went trial before a jury on November 19, 2012, and so the court states the facts and interprets the evidence in the light most favorable to the plaintiff. *In re Exxon Valdez,* 270 F.3d 1215, 1221 (9th Cir. 2001). The jury reached a verdict and found that plaintiff's origin and/or race were the sole reason and/or motivating factor for the defendant to deny plaintiff training, deny him promotions and/or terminate his employment (#61). The jury plaintiff awarded $53.98 in compensatory damages for emotional distress and $500,000.00 in punitive damages. *Id.*

Plaintiff originally worked as first assistant manager for a Qdoba restaurant in Fallon, Nevada for about five months before it closed. Tr. 113-116. He was briefly transferred to a Qdoba in Spanish Springs, Nevada, but the commute from Fallon was difficult, so plaintiff began to explore the possibility

of a position at the Fallon Jack-in-the-Box, since he knew that the restaurants were under joint ownership. Tr. 117, 392-93. Plaintiff interviewed with Jack-in-the-Box area manager Chris Pennington ("Mr. Pennington") to request the transfer. Tr. 118-19. Mr. Pennington told plaintiff about the job description, job requirements, the training program and possible benefits that would be available in the future as an assistant manager. Tr. 381. Mr. Pennington explained the bonus program that was available for assistant managers and managers once their training was completed. Tr. 381. The training program included knowing all of the employee positions in the restaurant, which generally took four to six weeks. Tr. 382. Depending on how quickly a person could learn, he or she would next learn about management responsibilities. Tr. 382. There is no specific time frame for learning management duties, since it depends on how quickly an individual learns and his or her own performance. Tr. 382.

Plaintiff began work at Jack-in-the-Box in April 2008, as first assistant manager at the same salary he had a Qdoba – $32,000. Tr. 166-167. When plaintiff began work at Jack-in-the-Box, he reported to the general manager, Pablo Gomez ("Mr. P. Gomez").[1] Tr. 167. Ester Rios ("Ms. Rios") was then assistant store manager, the same position plaintiff held. Tr. 422-23. Two of Ms. Rios's sisters also worked at the restaurant. Tr. 137.

At about the same time plaintiff came to work at Jack-in-the-Box, Mr. P. Gomez and Mr. Pennington were approved for transfers to Colorado. Tr. 387, 423. At that time, Mr. Pennington promoted Ms. Rios to replace Mr. P. Gomez as manager because she had worked there for several years as assistant manager at the Fallon store, and she had demonstrated ability in achieving results at the restaurant. Tr. 387. Mr. P. Gomez continued to serve as manager until his transfer in September 2008. Tr. 426.

The practice at the restaurant was that the restaurant manager worked the morning shift, which included duties such as scheduling, inventory, food ordering, and bank deposits. Tr. 426-27. The assistant manager worked in the afternoons or evenings to cover the remaining shifts. Tr. 427. When Ms. Rios was first assistant manager, she worked the later shifts, and when she was promoted to

---

[1] Mr. Pablo Gomez and Mr. Martin Gomez are brothers, so the court refers to them as "Mr. P. Gomez" and "Mr. M. Gomez." Tr. 357.

2

manager, she worked the morning shift and assigned plaintiff to her former shifts later in the day.  Tr. 427-28.

### A.      Training

Mr. P. Gomez was responsible for plaintiff's training, which included training on the fry station, the hamburger station, the drive-though station, and maintenance.  Tr. 121, 128.  Plaintiff was also trained on crew and shift leader training, as well as a ServSafe classes to learn proper service procedure so plaintiff could become certified in ServSafe.  Tr. 123, 127, 170.

When he started work, Mr. P. Gomez gave plaintiff a team leader training booklet, and he signed the booklet in June 2008, to signify plaintiff had completed all of the activities in the booklet,  including team leader practice duties.  Tr. 167-169.  Plaintiff was also given a training binder that contained the following assistant manager training duties:  food costs, safety and security, equipment, guest services, labor management, cash management, administration, foresight, and ServSafe.  Tr. 169-70.  Mr. P. Gomez reviewed the training manual with plaintiff and provided answers to questions so that plaintiff could complete the manual. Tr. 171.  Plaintiff also completed several computer-based training ("CBT") modules.  Tr. 121, 171-72.

Plaintiff testified that he should have received training in managerial duties, such as bank deposits, ordering, scheduling, and other office duties.  Tr. 122.  Although he did not perform these duties while at work, plaintiff admitted that Mr. P. Gomez showed him how do food ordering, bank deposits, inventory, and scheduling.  Tr. 185-87.  While Mr. P. Gomez was still manager, Ms. Rios testified that she attempted to train plaintiff in how do conduct an inventory, but he told her he already knew how to do this.  Tr. 424-25.  Plaintiff did not complain to Ms. Rios about scheduling, that he wanted to do inventory and food ordering, or that he lacked training to work on his own, so she scheduled him to run shifts on his own.  Tr. 428, 433-34.  Ms. Rios testified that plaintiff did not complain to her that he lacked training to work on his own.  Tr. 434.

### B.      Complaints to the Area Manager Mr. Pennington: Summer 2008

Sometime in July, after plaintiff had been working at Jack-in-the-Box for three months, he complained to Mr. Pennington that he was not getting adequate training.  Tr. 128.  Plaintiff was

3

concerned that he was routinely scheduled for the late shift, that he was not scheduled to work in the morning, and that he felt that after eight weeks, his training had stopped. Tr. 128-29. In addition to lack of training, plaintiff complained that he was not receiving bonuses and that he was subject to unequal treatment, including discriminatory slurs. Tr. 129-30. According to plaintiff, Mr. Pennington told him not to worry, that plaintiff would be trained before Messrs. Pennington and P. Gomez left for Colorado, but that he sidestepped the other concerns. Tr. 129.

As for racial slurs, Mr. Pennington testified that plaintiff never complained of discrimination because he is not of Mexican origin, that other managers or employees made comments about his race or national origin, or suggested he was not getting trained because he was not Mexican. Tr. 389. Had plaintiff made these complaints, Mr. Pennington said he would have conducted a store-level investigation and interviewed the individuals alleged to have made the comments. Tr. 390. If that was not possible, the matter would be turned over to human resources for investigation. Tr. 390.

Mr. Pennington did recall that plaintiff complained that other employees were not treating him with respect and that when plaintiff told employees to do something, they would not listen or would not respond in a positive manner. Tr. 390. Mr. Pennington suggested that since he was still in training, plaintiff should consider going to the other managers to ask for help in addressing these concerns. Tr. 391. He also told plaintiff that a key to getting respect is to give respect to the employees and other managers; otherwise, people might believe that he was unwilling to learn and listen and just wanted to get through the training so he could be in charge. Tr. 391. Plaintiff responded that he would work on this. Tr. 392. Mr. Pennington testified that before he moved to Colorado in mid-July 2008, he met a final time with Mr. P. Gomez and told him to make sure he completed the assistant manager book with plaintiff to insure plaintiff completed his training. Tr. 386-87. Mr. Pennington called Mr. P. Gomez after his transfer to Colorado and confirmed that plaintiff was completing his training. Tr. 386.

    **C.**    <u>**Caleb Sayler becomes Area Manager: August 2008**</u>

Upon Mr. Pennington's departure for Colorado, Caleb Sayler ("Mr. Sayler") was made area manager, which included the Fallon store. Tr. 300. During his first month on the job, Mr. Sayler visited his new stores to meet the management teams, learn about sales trends, and how the stores were

4

1  functioning. Tr. 301. Mr. Sayler met with Mr. P. Gomez before he left for Colorado, and he explained
2  that plaintiff was new with the store and was finishing his assistant manager training. Tr. 301.
3  However, Mr. P. Gomez also reported that there was some friction among plaintiff and the other store
4  employees, which Mr. P. Gomez characterized as "little things," such as kidding getting out of hand.
5  Tr. 301-02. Plaintiff was upset about a particular incident in which plaintiff threw a pickle at someone,
6  and the employee tossed water back at him. Tr. 301-02. Plaintiff asked Mr. P. Gomez to reprimand that
7  employee, and Mr. P. Gomez agreed to do so, but told plaintiff that managers were expected to be role
8  models. Tr. 302.

9       After Mr. P. Gomez left the store, Mr. Martin Gomez ("Mr. M. Gomez") came in to assist with
10 the transition when Ms. Rios became manager. Mr. M. Gomez reported to Mr. Sayler about
11 communication problems plaintiff was having with the other employees. Tr. 304-05. Mr. Sayler
12 decided it was time to take some action, so he provided plaintiff with some written coaching tips to
13 enhance communications with employees. Tr. 305. This included effective communications, tone of
14 voice, body language, words that are used, courtesy, praise, and disciplining employees in private. Tr.
15 305.[2] Mr. M. Gomez gave plaintiff the coaching tips, but plaintiff declined to sign it. Tr. 181.

16     **D.**    **Meeting between Plaintiff and John Thompson: September 15, 2008**

17      After he declined to sign the coaching tips, plaintiff traveled to Reno to meet with John
18 Thompson ("Mr. Thompson") at the Reno Jack-in-the-Box office. Tr. 182-83. Although Mr. Thompson
19 had no supervisory control over the Fallon store and told plaintiff as much, Mr. Thompson agreed to
20 speak with plaintiff. Tr. 187, 293. Plaintiff testified that he told Mr. Thompson about his complaints:
21 lack of training, no bonuses, disrespect, unequal treatment, and discrimination. Tr. 184. After hearing
22 from plaintiff, Mr. Thompson again explained that these issues had to be resolved within his store and
23 with his area manager. Tr. 187. Mr. Thompson also told him there is an ethics hotline employees can
24 call, although because the Fallon store is a franchise, it may not help, as it is mainly used for corporate

---

27     [2]Trial Exhibit 9 was not admitted into evidence; however, the court is relying on Mr. Sayler's testimony.

stores. Tr. 188. Plaintiff testified that Mr. Thompson told plaintiff there was really nothing he could do for him, so plaintiff thanked Mr. Thompson and left. Tr. 188.

Mr. Thompson also testified about his meeting with plaintiff. Mr. Thompson recalled that plaintiff complained about his lack of training, that he had not received a bonus yet, that he had not been given the combination to the safe to do deposits, and that he felt it was unfair that Ms. Rios's sisters did not have to work graveyard when he did. Tr. 291-295. Mr. Thompson testified that plaintiff did not complain about being treated differently because of his race or national origin, he did not report a claim of discrimination, he did not state that managers had made comments about his race or national origin, and he did not report that managers had made comments to him about not being Mexican. Tr. 292-93. Had plaintiff made such complaints, Mr. Thompson would have reported those concerns to the area manager who would have gone straight to human resources. Tr. 296-97. Mr. Thompson did not make such a report because plaintiff did not make those kinds of complaints about his workplace. Tr. 297. Mr. Thompson testified that he told plaintiff he would pass on plaintiff's concerns to the new area manager, Mr. Sayler. Tr. 293. Mr. Thompson did not speak to plaintiff again, but he did report his conversation with plaintiff to Mr. Sayler that same day when Mr. Sayler visited the Reno office. Tr. 293-94.

### E.   Mr. Sayler's Meeting with Plaintiff after the Thompson Meeting: September 18, 2008

Between plaintiff's meetings with Mr. M. Gomez and Mr. Thompson, Ms. Rios also spoke with Mr. Sayler about plaintiff's problems in communicating with other employees. Tr. 312. By this time, Mr. Sayler had spoken with Mr. Thompson about his meeting with plaintiff, and so Mr. Sayler went to the Fallon store to meet with plaintiff on September 18, 2008. Tr. 188, 314. Plaintiff testified that he told Mr. Sayler he was concerned that his training had stopped, that he was being treated unequally, and he was experiencing discrimination. Tr. 137. Mr. Sayler asked plaintiff what plaintiff thought should be done, and plaintiff responded by drawing a pictograph of Mr. P. Gomez, Ms. Rios, and her two sisters. Tr. 137. Plaintiff explained that the problem was that since Mr. P. Gomez was leaving for Colorado, Ms. Rios would become the manager, and one sister would become a first assistant, and one

6

sister would become second assistant. Tr. 138. Because plaintiff was hired as a first assistant manager, his hiring prevented the promotions of Ms. Rios's sisters. Tr. 138. According to plaintiff, Mr. Sayler acknowledged the nepotism, but commented that removing one sister would not solve the issue; instead, Mr. Sayler suggested that plaintiff consider a move to the Fernley store as a solution. Tr. 138. Plaintiff lacked transportation to Fernley, but he told Mr. Sayler he would consider this. Tr. 197. Some time after this meeting, plaintiff told Mr. Sayler in either a phone call or during an in-person visit to the store that plaintiff did not have transportation to transfer to Fernley. Tr. 197. Plaintiff failed to return to work shortly after this. Tr. 198.

Mr. Sayler confirmed that he and plaintiff met to discuss plaintiff's concerns. Tr. 314. Plaintiff acknowledged that Mr. Pennington and Mr. P. Gomez had spoken with plaintiff about his communication problems with other store employees. Tr. 314-15. Plaintiff again expressed his concern that the other employees did not respect him, that he was left to do "the dirty work," and he was not being properly trained as a manager. Tr. 191-93. Mr. Sayler talked with plaintiff about being a team player and how people can earn respect. Tr. 315-16.

Mr. Sayler testified that plaintiff did not tell him he was suffering from discrimination, he did not tell him that other managers made comments about his race or national origin, and he did not report statements Ms. Rios or Mr. P. Gomez made about not being given duties because he is not Mexican. Tr. 325-26.

Plaintiff also complained that he hadn't received any bonus, and Mr. Sayler agreed to look into this. Tr. 317. However, the reason plaintiff had received no bonuses is that plaintiff had not completed his training. The final step in the assistant manager training process was completion of a manager training class, but these classes are offered only once a quarter to insure there are enough people to participate in the class. Tr. 318-19. The next assistant manager training course was scheduled for late October or early November 2008. Tr. 319. By that time, plaintiff stopped showing up for work, he was deemed to have abandoned his job, and he was terminated. Tr. 329.

7

**F.    Summary of Discrimination and Slurs**

Plaintiff testified that three people at the Fallon store engaged in discriminatory treatment and/or made racial slurs, which are summarized below:

1.   *Mr. Pablo Gomez*

   a.   When plaintiff admonished other employees that they were not throwing out burgers after a certain time period, they became irate and responded that since they had trained him, he didn't know what he was talking about. Tr. 130-31. Plaintiff complained to Mr. P. Gomez who responded that plaintiff did not get respect from the other employees because he had to earn their respect and because he is not Mexican. Tr. 131. When plaintiff replied that he is of Spanish descent, Mr. P. Gomez said this didn't count, since plaintiff did not speak Spanish. Tr. 131.

   b.   Mr. P. Gomez scheduled plaintiff for work six days in a row, and when plaintiff asked why, Mr P. Gomez told him he had had two days off the prior week. Tr. 132. This happened again, and when plaintiff asked about it, Mr. P. Gomez replied, "Your ass is mine, I can work you seven days in a row. I can be a real asshole. Besides, you're white, you can handle it." Tr. 132.

   c.   Plaintiff called in sick once with a doctor's excuse, and Mr. P. Gomez wrote him up for calling in sick because plaintiff failed to follow the policy that requires employees to call in sick two hours before their shifts start. Tr. 132.

   d.   One time there was a managers' meeting and everyone was speaking in Spanish. Plaintiff asked Mr. P. Gomez to ask everyone to speak English and Mr P. Gomez replied, "Don't worry about it. I'll translate to you later." Tr. 132-33. Plaintiff walked out of the meeting and went home. Tr. 133.

   e.   One time plaintiff asked Mr. P. Gomez why he was not receiving a bonus check like the other managers, and Mr. P. Gomez replied that plaintiff was not contributing to the restaurant. Tr. 124.[3]

2.   *Ms. Rios*

   a.   After Ms. Rios became the manager, she kept him working late nights, she did not give him the combination to the safe like Ms. Rios's sister, who was the second assistant manager, and Ms. Rios told him that only Mexicans are given the safe combination. Tr. 133.

---

[3]There was no evidence that plaintiff did not receive a bonus on account of discrimination, or that he would have received bonuses if he had been eligible. The corporate franchise group decided store bonuses, not store management. Tr. 326-27. An assistant manager had to be certified to receive bonuses, and since plaintiff had not yet attended the assistant manager training, he was not yet eligible for the program. Tr. 318-20. By the time of the next training course, plaintiff had left his employment with defendant. Tr. 318-19.

      b.      There were five shift leaders and two of them were Ms. Rios's sisters, which plaintiff felt was inappropriate.  Tr. 133.

      c.      Plaintiff asked Ms. Rios to train him in the office and to train with her in the morning.  Tr. 135.

### 3.  *Mr. M. Gomez*

      a.      On September 18, 2008, the same day that plaintiff met with Mr. Sayler, Mr. M. Gomez pulled plaintiff aside and told him, "You're either going to quit, they're going to be making life hard for you, or something is going to happen, and it's going to be your word against them, and you're never going to fit into the family here, so you might as well work with white people, he said, with your kind."  Tr. 139, 197-98.

Plaintiff knew that Erika Ramos was the human resources managers, but he did not report these incidents to her.  Tr. 198-99.  Plaintiff testified that he did not think it would make any difference, since he had already complained to his supervisors.  Tr. 199.

### G.  **Plaintiff's Employment Ends**

Plaintiff believes that October 14, 2008 was his last day of work at Jack-in-the-Box.  Tr. 201.  Plaintiff did not report to work because he had been arrested for a DUI and was in jail.  Tr. 203.  When plaintiff failed to show up for work, Ms. Rios called him, but was unable to reach him.  Tr. 329-30.  Defendant then sent plaintiff a letter and asked him to contact the store.  If he failed to do so, defendant would assume he had abandoned his job.  Tr. 330-31.  Plaintiff never responded to the letter sent to his last known address, and it was returned unopened.  Tr. 330-31.  On October 19, 2008, Mr. Sayler completed a termination form, noting that it appeared plaintiff had abandoned his job.  Tr. 330.

Plaintiff was initially incarcerated at the Churchill County Jail until he was extradited to Cobb County, Georgia, for a probation violation.  Tr. 202-03.  Plaintiff remained in prison until October 14, 2009.  Tr. 202-05.  Although plaintiff testified that had he not suffered discrimination at Jack-in-the-Box, he would have the opportunity to be working there, he admitted that because he was incarcerated from the time of his DUI arrest until he was released one year later in October 2009, he could not work anywhere during that time period.  Tr. 204.

9

### H. Plaintiff's Charge of Discrimination: Nevada Equal Rights Commission

On October 29, 2008, while he was incarcerated, plaintiff submitted a charge of discrimination to the Nevada Equal Rights Commission under penalty of perjury. Tr. 206. Plaintiff attested that the latest date of alleged discrimination was October 22, 2008, even though he was in jail on that date and not working. Tr. 206-07. Plaintiff also attested that he left employment with Jack-in-the-Box "for the sake of his sanity and health to remove [myself] from the hostile environment." Tr. 209. Plaintiff acknowledged that he gave no notice of his resignation, but stated in the charge of discrimination that he would never become an area manager because he had to remove himself from the hostile work environment. Tr. 210. Although plaintiff was in jail and could not work anywhere, he felt that the discriminatory conduct caused him to drink, which resulted in his DUI, which, in turn, resulted in a probation violation that sent him back to prison for a year. Tr. 210-11. In the remedy request, plaintiff claimed $640,000.00 in lost salary based on a twenty-year career with Jack-in-the-Box, as well as a claim of $250,000.00 for pain and suffering. Tr. 212-13. Plaintiff did not disclose to the Nevada Equal Rights Commission or the Equal Opportunity Employment Commission that he was incarcerated and could not have continued to work at Jack-in-the-Box. Tr. 214-15.

### I. Emotional Distress

Plaintiff completed a remedy request on the Nevada Equal Rights Commission complaint, and asked for compensatory damages for medical costs in the amount of $53.98 for Xanax and Prozac prescriptions for anxiety and depression because of "what he was going through" at work. Tr. 147-48. Plaintiff testified about his pain and suffering as follows:

> It was disheartening. I was angry, you know, it caused a lot of anxiety. I was uneasy about – I didn't want to get out of bed and go to work because I just – I felt that no one in the upper management was doing anything so that gave them more power to – that gave them more – more reason to think that it was okay. And I was very sad. I was apprehended [sic] with – just a lot of emotions, angry, sad, I was completely powerless to say anything.

Tr. 215.

Dr. Robert Hemenway ("Dr. Hemenway"), also testified about his treatment of plaintiff. Dr. Hemenway, who specializes in the treatment of sex offenders, began seeing plaintiff weekly in 2006, as a term of plaintiff's release on probation for a sexual offense. Tr. 267-68, 271. Dr. Hemenway met with plaintiff six times in a two-year period. Tr. 282. Dr. Hemenway recalled that plaintiff discussed his unhappiness at work in May 2008, that the Hispanic people who worked with him discriminated against him, and that he felt like the odd man out. Tr. 269, 279. In May 2008, while plaintiff was working at Jack-in-the-Box, plaintiff also told Dr. Hemenway he was trying to get another job in Colorado, which would include a $10,000 bonus and moving expenses. Tr. 279-80. In June 2008, plaintiff talked with Dr. Hemenway about his efforts to overturn his sex offense conviction in Georgia, and Dr. Hemenway's notes contain no notations about issues with Jack-in-the-Box. Tr. 280. Dr. Hemenway had a final phone meeting with plaintiff on October 15, 2008, and plaintiff asked Dr. Hemenway to write a letter to the judge in Georgia stating that plaintiff did not commit the offense in that state and that the victim was lying, but Dr. Hemenway did not write the letter. Tr. 281-82.

None of Dr. Hemenway's notes contains any reference to Jack-in-the Box or any alleged emotional distress due to discrimination at Jack-in-the-Box. Tr. 282. Dr. Hemenway's notes do mention other problems plaintiff discussed: financial problems, problems with his sex offense conviction, family problems, and problems keeping a job. Tr. 274-77, 279-82, 285-87. With respect to plaintiff's level of functioning, Dr. Hemenway could not recall his deposition testimony at trial, and it was read into the record:

> Q: Do you have any opinion about [plaintiff's] mental state?
>
> A: Did I have an opinion at the time?
>
> Q: Yes. Let's go without the time. Let's stick with 2008 during the times you saw him in 2008.
>
> A: I would say he was functioning a little below standard, not intellectually, intellectually he was fine, but he was having trouble keeping work.
>
> Q: Yes.
>
> A: There had been some problems in his family. I think his sister was molested or raped in Fallon. That had caused a great deal of stress for him, and he was having problems prioritizing his life.

11

| | | |
|---|---|---|
| Q: | Yes. | |
| A: | So, you know, there were stressors on him, and so I would say he was functioning a little below. I wouldn't say he was depressed in the sense of suicidal over those issues, not that I know of, at least. That is, it's three years ago. | |

Tr. 285-87.

## II. Legal Discussion and Analysis

Jack-in-the-Box contends that the Due Process Clause places limits on awards of punitive damages and contends that the $500,000 in punitive damages awarded in this case is excessive in light of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). Three guideposts determine a review of a punitive damages award: (1) the degree of reprehensibility [of the conduct at issue]; (2) the disparity between the harm suffered and the punitive damages award; and (3) the difference between the remedy and the civil penalties authorized or imposed in similar cases. *Id.* at 574-75.

### A. Reprehensibility

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) lists five factors the court should consider in evaluating reprehensibility of a defendant's conduct. The Supreme Court earlier noted, "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW,* 517 U.S. at 575-76. Punitive damages awarded against the defendant should reflect "the enormity of the offense." *Id.* The court now considers these five factors.[4]

#### 1. Was the harm physical as opposed to economic?

Plaintiff in this case did not suffer physical harm; rather, he testified that he was angry, sad, disheartened, anxious, and felt powerless. Plaintiff incurred $53.98 in expenses for Xanax and Prozac prescriptions. Although plaintiff did see a therapist, the evidence reveals that plaintiff had several other stressors in his life, including family problems, inability to hold down a job, financial problems, and problems with the criminal justice system. Tr. 274-77, 279-82, 285-87. The emotional distress plaintiff

---

[4]The court notes that in plaintiff's three and one-half-page opposition, he only discusses reprehensibility in general terms, leaving the court to piece together, as best it can, plaintiff's analysis of this important guidepost.

suffered resulted in *de minimus* special damages and cannot solely be attributed to the alleged race discrimination during his six-month tenure at Jack-in-the-Box. This factor weighs in favor of defendant.

### 2. Did the tortious conduct evince a reckless disregard for the health and safety of others?

There is no evidence on the record that weighs in favor of plaintiff with respect to this factor, and plaintiff concedes as much, since he did not address it in his opposition to the motion. As defendant correctly points out, this is a disparate impact case, as opposed to a hostile work environment case, and the discrimination plaintiff testified about consisted primarily of stray remarks with little adverse impact on the terms and conditions of his employment. The evidence reveals that plaintiff did receive training, although it may have been delayed as a result of the impending transfers of both the store manager and area manager to Colorado during the six-month period plaintiff worked at Jack-in-the-Box. There is no evidence of discriminatory termination, as plaintiff abandoned his job because he was arrested and put in jail for a DUI. There is also no evidence this plaintiff's physical health was adversely affected, apart from some anxiety and stress. Finally, there is no evidence of threats of violence or physical harm. This factor weighs in favor of defendant.

### 3. Was the plaintiff financially vulnerable?

Plaintiff was hired as an assistant manager at the same annual salary he received at Qdoba – $32,000.00. There is no evidence that plaintiff was financially vulnerable, and once again, plaintiff appears to concede this factor because he does not address it. This factor weighs in favor of defendant.

### 4. Did the conduct involve repeated actions, or was it an isolated incident?

Defendant contends that the alleged discrimination plaintiff claimed to have suffered is fairly characterized as isolated, since this is a single-plaintiff case, no other non-Mexican employees have made similar claims of race discrimination, and there is no pattern of such discrimination (#65).

Plaintiff asserts that he was not trained in two months even though "Defendant knew its Fallon store was predominately Hispanic," but nevertheless "put Plaintiff there with promises about becoming a certified, fully trained manager within two months" (#68). Plaintiff also claims that there was "a plan" to keep plaintiff from being promoted, that the store manager and area manager ignored his complaints

or made matters worse, that he was told he would not succeed because he did not speak Spanish and was not Mexican, that management did not investigate his complaints of "differential treatment," that he did not get to work the day shift, and that Mr. Sayler suggested he move to the Fernley store as a solution to plaintiff's concerns. *Id.* Plaintiff further contends that instead of addressing his concerns, defendant "began to build a file on him." *Id.* Plaintiff provides no citation to evidence presented at trial for any these assertions. It is for the parties to support argument with facts. Argument and conjecture are not evidence.

In reply, defendant addresses each of plaintiff's contentions. Defendant characterizes plaintiff's comment that by hiring plaintiff to work at the Fallon store where many employees are Hispanic as somehow reprehensible is not only baseless, but racist. The court agrees. Moreover, plaintiff misstates the testimony of *all* of the witnesses, including plaintiff, by suggesting that plaintiff was to be trained as a manager, much less in two months. It is undisputed that plaintiff was hired as an *assistant* store manager, and there is no evidence in the record that defendant told plaintiff he would be fully trained, even as an assistant manager, in two months. In fact, plaintiff did receive training on all of the stations at the restaurant, as well as crew and shift leader training, ServSafe training, team leader training, assistant manager training on food costs, safety and security, equipment, guest services, labor management, cash management, administration, and foresight. Tr. 121, 123, 170, 168-69, 169-71, 121-171-71, 122 .

Plaintiff alludes to a "plan to keep Plaintiff from being in competition with Rios, an Hispanic, for the position to which she [was] ultimately promoted" (#68). As defendant points out, the evidence is to the contrary. Mr. Pennington testified that when he learned that Mr. P. Gomez would also be transferred to a store on Colorado, he announced that Ms. Rios would be promoted to store manager when he left. Tr. 387. This was in April 2008, the same time plaintiff came to work for Jack-in-the-Box. Mr. Pennington promoted Ms. Rios because she had worked at the restaurant for several years, and she had strong experience as an assistant manager. Tr. 387, 421, 423.

14

Plaintiff next contends that management ignored his complaints or made matters worse after he complained. Defendant cites to the following as evidence of plaintiff's complaints to management and the response:

a. When plaintiff talked with Mr. Pennington sometime prior to July 2008, plaintiff complained of unequal treatment, he told Mr. Pennington he needed to speak with him, and Mr. Pennington responded by suggesting plaintiff "give it a little extra effort" and "everything will be fine." Tr. 129.

b. In July 2008, plaintiff told Mr. Pennington that his training had stopped and he was worried that once Mr. P. Gomez left, his training would not continue. Tr. 129. Mr. Pennington told him not to worry and that he would make sure the training was completed before Mr. P. Gomez left for Colorado. Tr. 129.

c. Plaintiff once again talked with Mr. Pennington in July 2008 and advised that aside from training issues, he was not receiving bonuses and was "being treated unequal," and Mr. Pennington told him not to worry about it. Tr. 130.

d. Plaintiff testified that Mr. Pennington did not follow up on his training because he was preparing to move to Colorado, but Mr. Pennington testified that after he moved to Colorado, he followed up with Mr. P. Gomez to insure plaintiff's training was complete and was told that it was. Tr. 130, 136, 386-87.

e. The final step for assistant manager training was a training class that was only held once a quarter so that there were enough people to justify the class. The next assistant manager training class was schedule in late October or early November 2008, but by that time, plaintiff stopped coming to work. Tr. 318-19.

f. Plaintiff visited with Mr. Thompson on September 15, 2008 to discuss his complaints about stagnant training, bonuses, disrespect, discrimination, and unequal treatment. Tr. 184-85. Mr. Thompson told plaintiff that since he was not the area manager for the Fallon store, plaintiff should address his concerns to Mr. Sayler. Tr. 187. Mr. Thompson spoke to Mr. Sayler that same day about plaintiff's concerns. Tr. 293-94.

g. After Mr. Thompson spoke to him, Mr. Sayler met with plaintiff at the Fallon store to discuss his concerns, spoke with him about the coaching document Mr. Sayler had earlier given him, and they discussed plaintiff's issues with Ms. Rios and her sisters, who also worked at the store. Tr. 188, 137, 195-96. They discussed plaintiff's concerns about nepotism, and Mr. Sayler suggested that removing one sister would not alleviate plaintiff's concerns; therefore, he suggested plaintiff consider moving to the Fernley Jack-in-the-Box so he could get a fresh start as assistant manager. Tr. 139, 196-97. Some time after the meeting, plaintiff recalls telling Mr. Sayler that he could not transfer because he lacked transportation. Tr. 197.

h. At this same meeting, Mr. Sayler discussed plaintiff's training with him, offered to review the assistant manager training book with plaintiff, but he did not have it at work. Tr. Tr. 193.

This court has reviewed the trial transcript, and although plaintiff certainly testified about instances of discrimination, he also complained about inadequate training, bonuses, nepotism, and lack

15

of respect, and working evening shifts. Messrs. Pennington, Thompson, and Sayler responded to his concerns, met with him, counseled him, and repeatedly suggested possible solutions. Even interpretating the evidence in a light most favorable to plaintiff, this factor weighs in favor of defendant.

### 5. Was the harm the result of intentional malice, trickery, or deceit, or mere accident?

Defendant's view is that plaintiff's race discrimination claim is based on the conduct and stray remarks of managers at the Jack-in-the-Box store that plaintiff found offensive, but that his actual dispute centered on failure to train, bonuses, nepotism, and his termination. This conduct does not rise to the level of intentional malice, trickery, or deceit.

Plaintiff does not directly address this factor. Instead, he offers unsupported argument and conjecture that defendant hid the truth, built a file and engaged in a cover-up. This factor weighs in favor of defendant.

In this case, none of the five aggravating factors associated with reprehensible conduct is present. The economic harm defendant inflicted on plaintiff amounted to $53.98, a nominal amount. There is no evidence of any conduct by defendant that evinced reckless disregard or the health and safety or plaintiff or others. Plaintiff was not financially vulnerable, and the harm was not the result of intentional malice, trickery or deceit. Even taking the evidence in the light most favorable to the plaintiff as it concerns whether defendant's conduct involved repeated actions or otherwise, the conduct complained of does not remotely approach reprehensibility. At worst, plaintiff's managers made isolated comments about race during his six-month tenure at Jack-in-the-Box. When compared to cases in which reprehensibility is found, this case does not come close. *See e.g., Bains LLC v. Arco Products Co.,* 405 F.3d 764, 767 (9th Cir. 2005).

### B. The disparity between the harm or potential harm plaintiff suffered and the punitive damages award

The second *BMW* guidepost requires the court consider the ratio between the punitive damages and the actual harm inflicted on the plaintiff. 517 U.S. at 580. This second guidepost does not turn on "a simple mathematical formula," and the Supreme Court noted that the analysis must relate back to the threshold "reprehensibility" determination and a "general concern for reasonableness." 517 U.S. at 581-

82. Higher ratios of punitive-to-compensatory damages may be justified where "a particularly egregious act has resulted in only a small amount of economic damages," or "in cases in which the injury is hard to detect or the nonmonetary value of the noneconomic harm might have been difficult to determine." *Id.* at 581. The Court noted that "[w]hen the ratio is a breathtaking 500 to 1 . . . the award must surely 'raise a suspicious judicial eyebrow.'" *Id.* at 583 (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 481 (1993) (O'Connor, J. Dissenting).

*Mendez v. County of San Bernadino,* 540 F.3d 1109 (9th Cir. 2008) is particularly instructive on this point. In *Mendez,* a police officer shot and killed plaintiff's son, Ignacio, during an armed standoff with police in the driveway of Mendez's home. Mendez and her other son, Angel, were placed in separate police cars for two hours, then taken to the station for questioning. Mendez did not speak or read English and had little education. Reyes, the police office who translated into Spanish for Mendez, did not tell her she was free to leave, did not tell her that Ignacio had been shot, and she signed a consent form at his direction, written in English, giving the police consent to search her home. Relying on Mendez's consent form, the police searched her home without a warrant. The jury awarded Mendez $1 each in nominal damages for her false arrest and illegal search claims and $250,000 in punitive damages against Reyes for acting in reckless disregard of her constitutional rights. After trial, the district court granted the county's motion to remit the jury award and reduced the punitive damages award to $5,000, finding the punitive damages award excessive "in light of the nominal compensatory damages awarded." *Id.* at 1120.

In considering the second *BMW* guidepost on appeal, the court looked at the ratio "between the punitive damages and the actual harm inflicted on the plaintiff." *Id.* at 1121, citing *BMW,* 517 U.S. at 580. In *Mendez,* the ratio of 125,000 to one was deemed "considerably in excess of the single-digit ratios the Court has deemed 'more likely to comport with due process' than higher ratios." *Id., see State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003). However, *State Farm* creates an exception: "ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *State Farm,* 538

U.S. at 425 (internal quotations omitted).[5] Applying this exception in *Mendez,* the court concluded that although the second *BMW* guidepost is not dispositive of the award, "the great disparity between the actual and punitive damages does not cut in Mendez's favor." *Mendez,* 540 F.3d at 1122.

The award of punitive damages in this case is $500,000 as compared to the compensatory award of $53.98 – a staggering ratio of 9,262 to 1. This is exponentially higher than the 500 to 1 ratio the Supreme Court characterized as "breathtaking." 517 U.S. at 583. The question then is whether the conduct of Jack-in-the-Box was so reprehensible to justify the jury's award. The court concludes it was not. There was no evidence in this case that the defendant acted with malice or reckless disregard, that the conduct evinced reckless disregard of plaintiff's health or safety, or that plaintiff was financially vulnerable. The conduct alleged involved a single plaintiff over a six-month period of employment during which plaintiff's primary complaints to management included discrimination, lack of training, lack of respect, and lack of bonuses to which he was not entitled. The evidence simply does not justify the astounding award of $500,000 in punitive damages. This guidepost favors defendant.

### C. Comparison between punitive damages award in this case to any civil or criminal penalties authorized or imposed in comparable cases

Defendant correctly notes that in a Title VII case, damages – including compensatory and punitive – cannot exceed $300,000. 42 U.S.C. § 1981(b)(3)(D). Defendant's position is that the statutory cap of $300,000 is the amount to be awarded in the most egregious case, and this case does not fit in that category.

Plaintiff concedes that the statutory cap warrants a reduction in punitive damages, but argues that the award should be reduced to the outer limits of the statutory cap of $299,946.02 – 5,556 times the compensatory damages award (#68). Plaintiff's rationale is somewhat opaque, but he appears to argue that *Mendez* supports an award here of $299,946.02 because the *Mendez* court "upheld punitive damages award five thousand times the compensatory award . . . and rejected a due process challenge to $5,000

---

[5] It is noteworthy that the *Mendez* court found that the "degree of reprehensibility . . . weigh[ed] against the jury's substantial punitive damages award here." *Menez,* 540 F.3d at 1121.

in punitive damages awarded despite only $1.00 in nominal damages"(#68). Plaintiff then goes on to revisit the second guidepost to support a reduction in the punitive damages to $299,946.02.

Noting that the reduction of punitive damages from $250,000 to $5,000 – a ratio of 2,500 to 1 - was significantly in excess of single digits, the court stated, "Although we agree that the second *Gore* [*BMW*] guidepost (the ratio), may have reduced relevance in Section 1983 suits involving only nominal damages, we do not agree with Mendez's contrary suggestion that this factor has *no* relevance" *Id.* at 1122 (emphasis in the original). The court acknowledged that while the second *BMW* guidepost was not dispositive of the punitive damages award, "the great disparity between the actual and punitive damages does not cut in Mendez's favor." *Id.*

As in *Mendez,* the ratio between actual and punitive damages in this case is not dispositive, but it is certainly relevant. The court looks to the primary *BMW* guidepost – reprehensibility – and concludes that because Jack-in-the-Box's conduct does not remotely approach level of misconduct warranting an award of $299,946.02, the court instead considers a punitive damages award that is "sufficient to deter the [defendant] from engaging in similar conduct in the future." 540 F.3d at 1122.

### III. Conclusion

Considering the *BMW* guideposts, the court concludes that the jury's award of $500,000 in punitive damages is unconstitutionally excessive in violation of due process. Therefore, the court grants defendant's motion to reduce punitive damages award (#65), and reduces the punitive damages award to $5,398.00, which is 100 times the amount of the compensatory damages award. This award is not trivial, but is also not disproportionate to the harm caused. Plaintiff's request that he be given the option to accept the remittitur of the punitive damages award or request a new trial on this issue is denied. In *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 285 F.3d 1146, 1151 (9th Cir. 2002), the court reduced the punitive damages award and concluded that where "a plaintiff would not be entitled to any greater award on remand," the plaintiff is not aggrieved. Plaintiff in this case would not be entitled to any greater award than 100 times the amount of compensatory damages; therefore the plaintiff will not be aggrieved.

Based upon the foregoing,

**IT IS ORDERED:**

1. Defendant's motion to reduce punitive damages award (#65) is **GRANTED;** and

2. The punitive damages award in this matter is reduced to $5,398.00.

IT IS SO ORDERED.

DATED: March 8, 2013.

_____
UNITED STATES MAGISTRATE JUDGE